<u>UNITED STATES DISTRICT COURT</u>
<u>FOR THE SOUTHERN DISTRICT OF NEW YORK</u>

| | | |
|---|---|---|
| **Samson Siasia** | : | **CIVIL ACTION NO.:** |
| **Plaintiff** | : | |
| | : | **21-cv-6516 (xxx)** |
| **V.** | : | |
| | : | |
| **Fédération Internationale de Football Association,** | : | **JURY TRIAL DEMANDED** |
| **Defendant** | : | **August 2, 2021** |
| | : | |
| | : | |

<u>**COMPLAINT**</u>

## I.     INTRODUCTION

1.   This action arises under 42 U.S.C. § 1983 of the Civil Rights Act, from, and seeks compensatory and punitive damages for, the defendant's exercise of governmental function of investigating and adjudicating a charge of bribery, a crime, against the plaintiff and depriving the plaintiff of his rights under the United States Constitution.

2.   The defendant's act investigating and adjudicating a charge of bribery, a crime, against the plaintiff  was "under color" of law, and meets the "public function" test. See, e.g., *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946) (corporation which wholly owned and operated town served public function and is a state actor).

3.   Investigating and adjudicating a charge of bribery, a crime, is a function which has traditionally been exclusively the domain of the government. See, e.g., Indictment, *United States v. Evans*, 17-cr-00684-(ER), Southern District, New York, November 7, 2017) (where the criminal defendant, a coach, was charged with accepting bribes from a third party, among others and in exchange, agreed to and did exert his official influence

over certain National Collegiate Athletic Association ("N.C.A.A.") student-athletes. The

N.C.A.A. left the investigation and adjudication of the bribery charge to the FBI and to

the federal Judicial branch of government).

4.   The "public function" doctrine holds that when private persons are engaged in the

exercise of governmental functions their activities are subject to similar constitutional

restrictions. *Giannattasio v. Stamford Youth Hockey Ass'n, Inc.,* 621 F. Supp. 825, 826–

27 (D. Conn. 1985), citing, e.g., *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed.

987 (1944) (electoral process public function); *Terry v. Adams*, 345 U.S. 461, 73 S.Ct.

809, 97 L.Ed. 1152 (1953) (same); *Marsh v. Alabama*, supra, (corporation which wholly

owned and operated town served public function).

5.   Here, Fédération Internationale de Football Association ("FIFA"), the worldwide

governing body of soccer, exercised governmental function when FIFA investigated and

adjudicated a charge of bribery, a crime, against Samson Siasia ("Siasia"), a United

States citizen, which function has traditionally been exclusively the domain of the

Federal Bureau of Investigation (FBI) and the United States Department of Justice,

(USDOJ) and the Judicial branch of government or the State government.

6.   After finding Siasia guilty, FIFA then imposed a fine of 50,000 Swiss Francs and

lifetime ban from using his professional coaching license that was issued by the U.S.

Soccer Federation. As a result, defendant is in violation of 42 U.S.C. § 1983 of the Civil

Rights Act, ("Section 1983") among others, for depriving plaintiff of his constitutional

rights under color of state law.

## II.      JURISDICTION AND VENUE

7.   This Court has jurisdiction over Plaintiff's Section 1983 claims pursuant to 28

U.S.C. §§ 1331 and 1343.

8.  This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332, in that this is a civil action between a citizen of a state and a citizen or subject of a foreign state, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

9.  This Court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367 since they are so related to his Section 1983 claims that they form part of the same case or controversy.

10. Venue is proper in this district under 28 U.S.C. §§ 1391(a) & (d) because the defendant is an alien corporation and has significant contact in this District and is currently organizing the 2026 FIFA World Cup in this District.

### III.    THE PARTIES

11. Plaintiff, Samson Siasia is an individual and citizen of the United States residing in Atlanta Georgia

12. Plaintiff holds a professional soccer coach license which was issued to him on April 05, 2009, by the U.S. Soccer Federation, a national federation member of FIFA, ("USSF").

13. Defendant, FIFA acting though it's officers, agents and employees, is an association organized under the laws of Switzerland and having its principal place of business at Hitziweg 11, CH-8032 Zurich, Switzerland. FIFA is the worldwide governing body of soccer (known as "football" by all other countries except the United States). Its membership is comprised of the national soccer federations of more than 210 countries. FIFA is also the organizer and owner of the worldwide rights to the FIFA World Cup and other FIFA men's and women's soccer tournaments.

## IV.    LEGAL PRINCIPLES

14.  "By the plain terms of    1983, two – and only two – allegations are required in order to state a cause of action under that statute. First, the plaintiff must allege that some person has deprived him of a federal right. Second, he must allege that the person who has deprived him of  that right acted under color of state or territorial law." *Gomez v. Toledo*, 446 U.S. 635, 640 (1980).

15. In order to state a § 1983 claim, a plaintiff must allege (1) that the challenged conduct was "committed by a person acting under color of state law," and (2) that such conduct "deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010) (quoting *Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir. 1994)).

16. A private party is a state actor if the private entity has exercised powers that are "traditionally the exclusive prerogative of the State." *Blum v. Yaretsky,* 457 U.S. 991, 1005, 102 S. Ct. 2777, 2786, 73 L. Ed. 2d 534 (1982) (citations omitted); see also, *Marsh v. Alabama,* supra.

17. Investigating and adjudicating a charge of bribery, a crime, is a function which has traditionally been exclusively the domain of the government. See, e.g., Indictment, *United States v. Evans*, supra.

18.  A trespass to a chattel may be committed by intentionally (a) dispossessing another of the chattel, or (b) using or intermeddling with a chattel in the possession of another." 1 Restatement (Second), Torts, § 217, p. 417 (1965). "One who commits a trespass to a chattel is subject to liability to the possessor of the chattel if, but only if, (a) he dispossesses the other of the chattel, or (b) the chattel is impaired as to its condition,

quality, or value, or (c) the possessor is deprived of the use of the chattel for a substantial time, or (d) bodily harm is caused to the possessor, or harm is caused to some person or thing in which the possessor has a legally protected interest." Id., § 218, p. 420.

## V.   FACTS

19. Siasia is a citizen of the United States with residing in Atlanta Georgia.

20. Siasia applied to the USSF, an affiliate national member of FIFA, for a professional soccer coach license ("Coach License"). USSF  issued Siasia the professional coach license on April 5, 2009.

21. The Coach License USSF issued was a requirement to apply for and be employed as a coach of soccer clubs and national teams worldwide.

22. With the Coach License issued by USSF, Siasia applied for employment to become the head coach for a national soccer team of several FIFA national members including USSF, Ghana Football Federation, Nigeria Football Association (now called Nigeria Football Federal ("NFF") and soccer clubs affiliated with these FIFA members, amongst others (Clubs").

23. NFF employed Siasia to be the head coach of NFF's Under-23 national soccer team for the 2008 Summer Olympics in China.

24. Siasia successfully reached the final in the 2008 Summer Olympics in China after winning several matches including against the United States Under-23 Olympics national soccer team.

25. Siasia and the Nigeria Under-23 Olympics national soccer team were awarded a silver medal in the 2008 Summer Olympics in China. The gold medal was awarded to the Argentina Under 23 Olympics national soccer team.

26. After the 2008 Summer Olympics ended, on March 17, 2009, the NFF appointed Siasia to be the head coach the Nigeria Under-20 Men's national soccer team for FIFA Under-20 World Cup qualifying soccer tournaments from September 24, 2009, to September 16, 2009.

27. At the end of the coaching assignment, Siasia unsuccessfully sought employment with FIFA national soccer federations and Clubs.

28. Siasia later secured a 6-months employment with Heartland FC, a Club affiliated with the NFF, starting in July 2010.

29. In September 2010, Siasia applied for employment to be the head coach for NFF senior national soccer team and successfully signed a 4-year employment contract on December 1, 2010, with 5,000,000 Naira monthly (equivalent to $33,333.33 monthly), each month for 48 months of the 4 year term of the Employment Contract, for a total sum of $1,599,999.99, exclusive of bonuses (estimated total value over 4-years: $799,999.99) and benefits such as car, house, business class airline tickets. In addition, the total value of Siasia's commercial right or interest during the 4-year term of the Employment was estimated to be $399,999.99.

30. Prior to applying for employment with the NFF, several FIFA agents approached Siasia to obtain his authorization to find him employment with national teams and Clubs.

31. In about March 2010, Wilson Perumal, whose business was arranging and fixing soccer matches for FIFA's national soccer federations, sent email to Siasia and offered Siasia employment as head coach for a Club that Mr. Perumal was going to take charge of and own. FIFA had knowledge of these matches for the national soccer federations and knew the FIFA match agents who arranged and fixed these matches.

6

32. At the time Mr. Perumal sent emails to Siasia and received email replies from Siasia, Siasia was in Atlanta, Georgia and using his mobile telephone devices with a T-Mobile service account in Georgia, USA.

33. The following are the email exchanges with Mr. Perumal:

1.   On 18 March 2010, Mr. Perumal wrote to the Coach (from his email address aishybaby20@yahoo.com.sg with the identification "aisha iqbal") the following message (the "1st Email"):

> *"Hi samson, how are u. I need a coach for a club i might be in charge soon. I will get in touch with you by the end of May 2010" (sic)*

2.   On 22 March 2010, Mr. Perumal (using the same email address) wrote to the Coach the following message (the "2nd Email"):

> *"Hello Sam,*
>
> *You have a reputation as a silver medallist coach in Beijing Olympics. I wish to be transparent with you in this matter. I am going to take over a club. I want to engage you as the head coach. It is an Australia 'A' league team.*
>
> *You know my nature of business. I will personally bring in 5 Players and dictate the show. You will do your coaching job and play along. I will not drag you into what I am doing. My players will take instructions from me. You will have just close one eye and do your coaching job. There is no relegation in this league. Noone can fire you.*
>
> *What amount will u be asking for as salary."* **(sic)**

3.   On 23 March 2010, the Coach replied to Mr. Perumal as follows (the "3rd Email"):

> *"You tell me what you can afford and A league, is it like the premiership team*
>
> *I know you are not trying to destroy my reputation? I worked very hard to get heremy brother.*
> **I wait on your reply Cheers**
>
> **Coach Siasia" (sic)**

4.     On 26 March 2010, the Coach sent again an email to Mr. Perumal asking him for a reply and update. The Coach sent the following message to Mr. Perumal (the "4th Email"):

> *"Iqpal.*
>
> *Am still waiting for your reply on the last e-mail.*
>
> *Is this JS[1] division club or not, and I want 50 thousand dollar as salary and asigning bonus.*
>
> *I wait for your respond on this issue. Finally*
>
> *when does the league start.Thank you*
>
> *Samson"* **(sic)**

5.     On 27 March 2010, Mr. Perumal replied to the Coach saying that (the "5th Email"):

> *"it is Australian A League. I will check with the owner if he is ready to offer 50,000 USD. Will revert soon. " (sic)*

6.     On 27 March 2010, the Coach replied to Mr. Perumal enquiring

whether he would also be paid a signing on fee. He also wanted to know whether he would pay taxes from the proposed salary and whether he would be given a house and a car. This email message stated the following (the "6th Email"):

> *" Ok. A league, is it like the Aussie Premiere league? What about signing fee and am I going to pay taxes of my salary. What about house and car?*
>
> *I need to know all this details. Thank you" (sic)*

7.    On 29 March 2010, the Coach sent another email to Mr. Perumal with the following message (the "7th Email"):

> *" Hey iqpal,*
>
> *Did you get my last email? I need more details on the proposition. there are questions, that need answers. please it and get back to me as soon as possible.*
>
> *Thanks Samson" (sic)*

8.    On 29 March 2010, Mr. Perumal wrote to the Coach informing him (the "8th Email"):

> *"I have submitted your request for 50,000 US dollars as salary for a month. They will revert to me soon.*
>
> *You can put forth your questions. Wilson Raj Perumal" (sic)*

9.    On 30 March 2010, the Coach replied to Mr. Perumal asking him

(the 9th Email"):

> *"Am i going to pay taxes on this amount if agreed and what*
> *about signing on fees, accommodation and car. Also need to*
> *know about flight tickets for me and family. I will be waiting*
> *for your soonest respond because I have other offers am*
> *looking at.*
> *Thank you.Coach Siasia" (sic)*

10.  On 30 March 2010, Mr. Perumal replied to the Coach saying (the "10th Email"):

> *"Will revert to you soon on your terms and conditions." (sic)*

11.  On 31 March 2010, Mr. Perumal wrote to the Coach informing him that he had forwarded his name to the club's committee. Mr. Perumal informed the Appellant that the committee will select the coach based on who they could afford, and that they were looking at a monthly salary of USD 30,000. This email message states the following (the "11th Email"):

> *"I have submitted your name. The committee have submitted*
> *a few. They will select based on who they can afford. They*
> *are looking at a 30,000 US dollar a month salary scale.*
>
> *I have stated you want 50,000 US dollar. House*
> *Car*

> *2 return tickets for you to Nigeria a year for u and your*
>
> *family" (sic)*

12.   On 4 April 2010, the Coach insisted with a response and wrote to Mr. Perumal the following message (the "12th  Email"):

> *"am still waiting for your reply. Thank you.*
>
> *Coach Samson." (sic)*

13.   On 4 April 2010, Mr. Perumal replied to the Coach saying (the "13th Email"):

> *"The result of the selection will be out on Monday. They have*
>
> *shortlisted 4.*
>
> *I have submitted your requests and lets hope for the best." (sic)*

14.   On 7 April 2010, Mr. Perumal wrote to the Coach as follows (the "14th Email"):

> *"The salary cap is 30,000 US dollars. 2 return tickets to Nigeria*
>
> *annually. Accommodation provided.*
>
> *A car.*
>
> *Tax paid for.*
>
> *I trip for family (wife and children) to and from Nigeria to*
>
> *Australia. What do you think my friend.*

**GOLDEN RULE NEVER DROP MY PLAYERS 6 FOREIGNERS DURING THE GAME." (sic)**

15.  On 8 April 2010, the Coach replied to Mr. Perumal (the "15th Email):

> **"I saw your GOLDEN RULES. I am fine with your offer but I need a signing on fee with it. I will take your offer if I don't find a better offer before I sign with you. And you have not told me if its I st division and the name.**
>
> **waiting to hear from you soon." (sic)**

16.  On 8 April 2010, Mr. Perumal replied to the Appellant (the "16th Email"):

> **"Sam you know we all want to make money and be happy in life. I have my ways of doing it and you have yours. I am very flexible person. I just want you to enjoy your term as a coach for I year and if all goes well you will get the 2nd year going.**
>
> **!just dont want to come in and create problem and burst the bubble on what i am doing. That's why i am very cautious with the name of the team. You make 30,000 US a month and just go with the flow. Dant worry about anything. We own the club and what we say is final. The**

*african players who i bring in will be under my control.*

*You will never be diractly involved with the players which*

*means the players will not be aware that you work with me.*

*You do your normal strict coaching job. Just turn a blind*

*eye. Never work against me and never replace my players*

*in a game unless they are injured beyond playing*

*condition.*

*What is the sign on fee your are expecting. Revert soon*

*please." (sic)*

17.  On 9 April 2010, the Coach replied to Mr. Perumal as follows (the "17th Email"):

*"I dont want to know anything that dont concern me. I will*

*do my job with the best of my abilities and you do us. i want*

*sign on bonus of 200 thousand dollars. we all trying to*

*make money, but the only money that I want is one we*

*agree on. I know you dont knmv this, there is always a sign*

*on bonus for the coaches and players too. And if I was*

*using my agent to talk with you, it will be more than what*

*we talking about.*

*Signing on bonus is what you use to settle yourself and some family problems before leaving.*

*You also know my career is very important to me, because I want to be the best in what i do.And also dont forget that I played in Australia 1996.*

*what about winning bonus?? I like to know when its going to start too. wait your reply.*

*Coach." (sic)*

18.  On 12 April 2010, the Coach send to Mr. Perumal the following message (the "l8 th Email"):

*"Please, your reply will very much appreciated to move us forward. Thank you once again for your confident on me. "*

*(sic)*

19.  On 12 April 2010, Mr. Perumal replied to the Coach saying (the "19th Email):

*"The club has turn down your request for 200,000 US dollars for winning bonus.*

*They have now acquired the services of an argentinian who is ready to take the job for 25,000 a month. "*

20.  On 12 April 2010, the Coach replied to Mr. Perumal informing

14

(the "20th Email"):

> *"I did not say 200.000 for winning bonus. I said for signing*
>
> *on fee. and i needed to know how much they paid for*
>
> *winning bonus.*
>
> *Is this the first time you are going to hire a coach ? i guess it*
>
> *is. Because it is normal for coaches and players to ask for*
>
> *signing fees.*
>
> *well good luck with the Argentina coach      I guess it wasnt*
>
> *meant to be.*
>
> *good luck…"*

34. The emails in ¶ 33 above, are the extent of the evidence in the Investigative

Report FIFA used[1] to charge and convict Siasia of bribery, a crime.

35. Mr. Perumal selected another coach to be the head coach for his Club.

36. As mentioned earlier, Siasia went on to secure employment as the head coach of

the NFF senior national team. Siasia's contract was terminated in October 2011, when the

NFF senior national team did not qualify for the African Cup of Nations soccer

tournament. Qualification for the African Cup of Nations was a condition of continued

employment as a head coach.

37. In around 2014, the NFF re-employed Siasia to be the head coach to qualify the

Nigerian Under-23 Olympics national soccer team for the 2016 Summer Olympics in

Brazil.

---

[1] These emails were extracted from FIFA's Final Investigation Report dated March 2019. FIFA found
Siasia guilty of bribery. See, attached Exhibit 2, Ruling of Court of Arbitration for Sport, at ¶ 39.

38. Siasia successfully qualified the Under-23 national soccer team for the 2016 Summer Olympics and participated in the 2016 Summer Olympics soccer matches in Brazil. Siasia's team was once again defeated by the Argentina Under-23 national soccer team in the quarterfinals.

39. Again, Siasia's employment ended with the end of the 2016 Summer Olympics.

40. At the time Siasia was going about his work as a coach, Mr. Perumal, in a parallel universe, was doing his business arranging and fixing soccer matches for FIFA's national soccer federations in Asia and Europe and Africa. See media report,

http://edition.cnn.com/2014/08/26/sport/football/match-fixing-wilson-raj-perumal-corruption/index.html

41. According to the media report, Mr. Perumal was arrested by Police in Finland and convicted for bribery and conspiracy to match-fixing. See, Media Report, at ¶ 40, supra.

42. As reported in the media report, while cooperating with Finnish prosecutors, Mr. Perumal turned over his electronic devices to the authorities. The electronic devices contained contact names and email and text communication. Finnish authorities then turned over the cache of information to FIFA Security officers. According to FIFA Security officer,

> "Perumal had 38 countries in one phone book contacts list -- he had officials and players from those 38 countries," Steans told CNN.
> "If you then go to his laptop address book, there were over 50. FIFA has 209 associations ... so we are talking a quarter of FIFA associations for one fixer," he added.
> "As we now know, he used most of these people and used them for his own ends and his syndicate's ends and made a lot of money out of it."

See, Media Report, at ¶ 40, supra.

43. From this cache of information, FIFA obtained the email communication between

Siasia and Mr. Perumal described in ¶ 33, above.

44. The FIFA did not turn over this email communication involving Siasia to the FIFA's national soccer federation in the U.S. the USSF, which issued Siasia's Coach License, for further transmission to the FBI.

45. Instead, FIFA exercised the public function[2] of investigating and adjudicating a charge of bribery, a crime, against Siasia.

46. According to FIFA's own private 'criminal' court, the Court of Arbitration for Sport, ("CAS"), FIFA, through its officer(s), agent(s) and or employee(s) found Siasia

> "responsible for the violation ("Bribery") contemplated by Article 11 FCE 2009. In essence, [Siasia] was convicted by the Adjudicatory Chamber to conspire, or at least attempting to conspire, with Mr. Perumal, a convicted match-fixer, for accepting to be recruited as a coach of an unidentified Australian club allegedly under the control of Mr. Perumal. In exchange of an employment contract with the unidentified Australian club, [Siasia] was willing to ignore and accept match manipulation actions of the unidentified player's conspiring with Mr. Perumal. The conclusions reached by the Adjudicatory Chamber were based on the emails exchanged between [Siasia] and Mr. Perumal during March-April 2010."

CAS Decision, preliminary remark, at ¶ 207.

47. The charge of bribery is a crime. Compare. *United States v. Evans*, supra.

---

[2] FIFA adjudicated a bribery charge against a U.S. citizen and found him "guilty" of accepting bribes and "banned him for life" from using his coaching license, a property of the U.S and then imposed a fine of 50,000 Swiss Francs. Unless the US government authorities, federal and state of Georgia, take action against FIFA for such exercise of government power to adjudicate and render a guilty verdict on a US citizen for the crime of bribery, the US government authorities would have acquiesced in FIFA's exercise of governmental power. Cf. *Marsh v. Alabama,* supra, where a corporation operated its own town and with its own sheriff and charged an individual with the crime of trespass. See, e.g., *Blumel v. Mylander,* 919 F. Supp. 423, 427 (M.D. Fla. 1996) (because the County delegated a "public function" to CCA, Blumel may seek to hold CCA liable under Section 1983 for depriving his liberty without due process.). Also where Courts have found state action where the government has attempted to avoid its constitutional obligations by transferring the function to a private entity. *Plain v. Flicker,* 645 F. Supp. 898, 908 (D.N.J. 1986), citing, *Evans v. Newton*, 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966); *Chalfant v. Wilmington Institute,* 574 F.2d 739, 740 (3d Cir.1978) (en banc); *Giron v. Corr. Corp. of Am.,* 14 F. Supp. 2d 1245, 1250 (D.N.M. 1998) (I conclude that the government function doctrine applies in New Mexico when the state delegates the running of a prison to a private contractor.).

48. Unlike, FIFA, the N.C.A.A. an association which regulates and organizes intercollegiate sports in United States, N.C.A.A. did not convict and punish Lamont Evans, the coach involved in the criminal case, *United States v. Evans*, supra. Instead, the N.C.A.A turned over the matter to the FBI and the Justice department which then indicted, prosecuted and convicted Lamont Evans for accepting bribery.

49. It was after the head coach was convicted and sentenced in the U.S. federal court that the N.C.A.A then used the evidence and conviction and sentencing from the criminal case, to discipline the head coach and impose a 10-year ban subject to a showing of cause why the ban should be lifted See, N.C.A.A. press release,

https://www.ncaa.org/about/resources/media-center/news/former-oklahoma-state-coach-s-acceptance-bribes-violated-ncaa-ethical-conduct-rules

50. In February and March 2019, FIFA sent Siasia a notice of the bribery charge by email to Siasia's yahoo email address.

51. According to Siasia, he used multiple email accounts including a Gmail account and did not always check the several thousands of emails he received.

52. Siasia was not aware of the bribery charge for which that FIFA indicted him until FIFA published to the whole world in or around August 16, 2019, FIFA's conviction and imposition of a life-ban on Siasia from using the Coach License, issued under the laws of the United States.

53. The Coach License is a property right secured by the U.S. Constitution under the Fourteenth Amendment. See, *Goldberg v. Kelly*, 397 U.S. 254 (1970) (where U.S. Supreme Court recognized that a professional license is a property right for the purposes of due process).

18

54. In violation of the fifth and the 14th Amendments to the U.S. Constitution, FIFA a government actor, deprived a United States licensee of a professional license without due process.

55. The due process that is due to Siasia, the coach licensee, include: (1) adequate notice of the bribery charge; (2) an opportunity for a hearing; (3) a fair and impartial hearing panel; (4) the opportunity to confront and cross examine adverse witnesses; (5) a decision based on the evidence presented; (6) a record of the proceedings and; (7) an opportunity for appeal or judicial review of the decision.

56. Under FIFA code, Siasia was mandated to appeal to CAS, if SIasia sought to challenge the FIFA guilty verdict and punishment of a lifetime ban from ever using the professional coach license and a monetary fine of 50,000 Swiss Francs.

57. Siasia was compelled to appeal his conviction of the crime of bribery[3] to CAS and he timely filed his appeal with CAS.

58. On June 21, 2021, CAS panel decided the appeal ("Ruling[4]") and reduced the lifetime ban FIFA imposed on Siasia from using the Coach License. See, Ruling at ¶ 272.

59. CAS panel ruled that the lifetime ban was disproportionate to the offense of bribery. See, Ruling at ¶ 271. Also see, ¶¶ 269-70.

60. FIFA's punishment of a lifetime ban from use of the Coach License was cruel and

---

[3] In convicting Siasia of Bribery, FIFA relied on Swiss Bribery law which is encoded in Article 11 of the FIFA Code of Ethics ("FCE") 2009. Similarly CAS relied on this Swiss bribery law to partially uphold FIFA's guilty verdict. In fact, the evidence clearly establishes that any act of bribery occurred on U.S. soil, in Atlanta Georgia and on telephone devices from T-Mobile account in Georgia. See, ¶ 32, supra. The sole evidence in the FIFA trial were emails which were caused to be transmitted by means of wire and radio communication in interstate and foreign commerce in the United States. If any crime was committed, only the FBI or Georgia State Police could investigate and bring charges of commercial Bribery. Indeed, unlike other states, Georgia does not criminalize commercial bribery even if the evidence supporting it exists.
[4] CAS Ruling confirmed this conviction. And FIFA's worldwide publication on August 16, 2019, also clearly stated that it "found Mr. Samson Siasia…. Guilty of having accepted that he would receive bribes…"

unusual punishment in violation of the Eight Amendment to the U.S. Constitution.

61. CAS also ruled that FIFA did not provide adequate notice of the bribery charge to Siasia. See Ruling at ¶¶ 174-5, 178.

62. The Ruling confirms that FIFA violated Siasia's due process rights under the Fifth and Fourteenth Amendments to the U.S. Constitution. FIFA did not provide any personal notice to Siasia as required to comply with his due process rights. See, e.g., *Mullane v. Cent. Hanover Bank & Tr. Co.,* 339 U.S. 306, 315, 70 S. Ct. 652, 657, 94 L. Ed. 865 (1950) ([W]hen notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it. The reasonableness and hence the constitutional validity of any chosen method may be defended on the ground that it is in itself reasonably certain to inform those affected.).

63. The FIFA's national federation member, the USSF which issued the Coach License has the contact information for the coach under its regulation.

64. In addition, FIFA convicted Siasia for bribery based on  grossly insufficient evidence, consisting exclusively of emails which the creators or recipients never explained to FIFA.

65. FIFA convicted Siasia for bribery without giving him an opportunity to confront and cross examine adverse witnesses.

66. Siasia has suffered and continues to suffer injury to his property right, his reputation as a soccer coach, and emotional pain , suffering, inconvenience, mental anguish and loss of enjoyment of life.

### VI.    LEGAL CLAIMS

**COUNT ONE:       VIOLATION OF THE CIVIL RIGHTS ACT, 42 U.S.C.
Section 1983, *et seq.***

67.     Based on the foregoing, Defendant's conduct in this regard was a violation
of the Civil Rights Act, 42 U.S.C. § 1983.

68. In particular, Defendant violated the Fifth and the Fourteenth Amendments to the
U.S. Constitution, when FIFA, a government actor, deprived a United States citizen
procedural due process rights during a adjudicatory proceeding that did not provide him
with one or more of the following: (1) adequate notice of the bribery charge; (2) an
opportunity for a hearing; (3) a fair and impartial hearing panel; (4) the opportunity to
confront and cross examine adverse witnesses; (5) a decision based on the evidence
presented; (6) a record of the proceedings and; (7) an opportunity for judicial review of
the decision.

69. Furthermore, after FIFA render a guilty verdict from  the aforesaid adjudicatory
proceeding, FIFA imposed a lifetime ban from using the Coach License, thereby
depriving Plaintiff of his property right to his professional coach license, in violation of
the Fifth and the Fourteenth Amendments.

70. Furthermore, the punishment of a lifetime ban from use of the Coach License
FIFA imposed on Plaintiff was disproportionate to the offense of bribery and was cruel
and unusual punishment in violation of the Eight Amendment to the U.S. Constitution.

71. In addition, the additional punishment of a fine of 50,000 Swiss Francs FIFA
imposed on Plaintiff was disproportionate to the offense of bribery and was cruel and
unusual punishment in violation of the Eight Amendment to the U.S. Constitution.

72. Plaintiff  is entitled to compensatory and punitive damages, attorneys' fees and
court costs.

**COUNT TWO:        TRESPASS TO CHATTEL**

73. Based on the foregoing, Defendant committed trespass to chattel when Defendant deprived Plaintiff of the use of his professional coach license by imposing a lifetime ban on Plaintiff from all soccer related activities, including from being employed as a coach of a national soccer team or soccer Club or any soccer team in the world.

74.     Accordingly, Plaintiff is entitled to damages and punitive damages, attorneys' fees and court costs.

**COUNT THREE:     INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

75.     Based on the foregoing, Defendant intentionally inflicted emotional distress upon the Plaintiff.

76.     Defendant is liable to Plaintiff for compensatory and punitive damages, attorneys' fees, and court costs.

**COUNT FOUR:        NEGLIGENCE**

77. The foregoing conduct of Defendant resulting in mental anguish, emotional distress injuries, losses and damages sustained by Plaintiff, was the direct and proximate result of the negligence, carelessness and recklessness of the Defendant in one or more of the following ways:

            a.   Failure to properly investigate the bribery charge although by a proper and reasonable exercise of care, Defendant could have and should have so done;

            b.   Failure to give adequate notice of the charge of bribery;

            c.    Improperly charging a crime of commercial bribery which is nonexistent in the place the acts occurred;

       d.    Improperly imposing a gross and disproportionate lifetime ban of a professional license for a non-existent bribery crime;

       e.    The negligent and reckless performance of its duties;

       f.    And engaging in all the other improper and reckless conduct alleged in this complaint.

78.   As a result of the negligence and carelessness and recklessness of the Defendant, as aforesaid, Plaintiff sustained and suffered personal loss, the full extent and nature of which are presently unknown; pain and suffering, mental anguish; and shock, fear, emotional distress, some or all of which injuries are, or are likely to be, of a permanent nature.

79.   As a further result of the negligence and carelessness and recklessness of the Defendant, Plaintiff was forced to incur expenses and costs.

80.  As a further result of the negligence and carelessness and recklessness of the Defendant, Plaintiff's ability to pursue and enjoy life's activities has been reduced.

81.  As a further result thereof, Plaintiff, has been, and in the future will likely continue to be, unable to pursue his usual activities to the same extent as he did before the Defendant's acts as aforesaid, all to his loss and detriment.

## **DEMAND FOR RELIEF**

Plaintiff claims:

    a.   Judgment;

    b.   annulment of the lifetime ban or any ban on Coach License;

    c. Global public retraction of guilty verdict of accepting bribe

    d.   Damages;

    e.   Punitive damages;

    f.   Double or treble damages;

    g.   Attorneys' fees;

    h.   Interests and costs;

    i.   Injunctive relief in the form of an order directing Defendant to respect the legal rights of others and;

    j.   Such other relief as in law or equity may pertain.

## JURY DEMAND

Plaintiff demands a trial by jury by all issues so triable.

PLAINTIFF
SAMSON SIASIA

By:_//s// Nitor V. Egbarin_ _____
    Nitor V. Egbarin, NE2436
    Law Office of Nitor V. Egbarin, LLC
    100 Pearl Street, 14th Floor
    Hartford, CT  06103-3007
    Tel: (860) 249-7180
    Fax: (860) 408-1471
    E-mail: NEgbarin@aol.com